DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**LIBERTY MUTUAL INSURANCE COMPANY** and
**LIBERTY MUTUAL FIRE INSURANCE COMPANY,**
Appellants,

v.

**JEFFREY H. WOLFSON**, et al.,
Appellees.

Nos. 4D18-3652 and 4D19-118

[June 24, 2020]

Consolidated appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Mily Rodriguez Powell, Judge; L.T. Case No. 16-016026 (03).

Frances G. De La Guardia of Holland & Knight LLP, Miami, and Isabel V. Alvarez of Law Offices of J. Christopher Norris, Miami, for appellants.

Alex P. Rosenthal and Amanda Jassem Jones of Rosenthal Law Group, Weston, for appellee Wolfson.

GERBER, J.

The insurers appeal from the trial court's final judgment following a jury verdict awarding benefits to the insured under two underinsured motorist (UM) policies. The insurers argue the trial court erred in three respects: (1) by denying the insurers' motion for directed verdict on the insured's claims for past wage loss and future lost earning capacity; (2) by allowing various experts' testimony into evidence; and (3) by denying the insurers' motion to set off from the jury verdict the amount of money which the insured received from settlement agreements with two other carriers.

We conclude, without further discussion, the insurers' first two arguments lack merit, and thus we affirm the jury verdict in the insured's favor. However, the insurers' third argument has merit. Therefore, we reverse the final judgment, and remand for the trial court to enter an amended final judgment which sets off from the jury verdict the amount of money that the insured received from the two settlement agreements.

## *Procedural History*

An underinsured motorist collided with the insured's car, causing the insured to suffer permanent injuries. The insured filed a claim under his UM policies with the insurers. The insurers did not pay the claim.

The insured then sued the insurers for breach of contract. The insurers stipulated the underinsured motorist was liable for the collision. At the close of evidence, the trial court granted the insured's motion for directed verdict on causation. Thus, the sole issue for the jury was the amount of the insured's damages caused by the collision. The jury determined those damages to be $810,000 for loss of earnings, $369,629 for medical damages, and $400,000 for pain and suffering, for a total $1,579,629.00.

The insurers filed a motion to set off from the verdict the amount of any settlements which duplicated any part of the verdict, and set the motion for an evidentiary hearing. For the hearing, the insurers subpoenaed the insured's third UM carrier (Nationwide) and the underinsured motorist's liability carrier (AIG) to testify regarding any settlements which those two carriers had reached with the insured.

At the evidentiary hearing, a Nationwide representative testified it had settled the insured's UM claim for injuries and lost earnings for $100,000. The insurers also introduced into evidence a copy of the insured's release of Nationwide in exchange for the $100,000 payment. The release provided, in pertinent part:

> JEFFREY H. WOLFSON, his heirs, assigns, legal representatives, successors and personal representatives, hereinafter referred to as the Releasing Party, for and in consideration of the total sum of ONE HUNDRED THOUSAND and NO/100 DOLLARS ($100,000.00), receipt of which is hereby acknowledged, have released … [Nationwide] … of and from any and all claims, actions, causes of action, damages or demands, both compensatory and punitive, in whatever name or nature, in tort, in contract or by statute, in any manner arisen, arising, or growing of whatever name or nature, past, present, or future, which rise out of or were the result of [the collision]. The parties acknowledge pending claims for UIM … benefits against [the insurers], which in no way are incorporated or contemplated in this Release and will remain open.

2

The insured did not dispute the $100,000 Nationwide UM benefits duplicated the jury-determined UM benefits against the insurers. However, the insured argued the insurers were not entitled to set off the $100,000 Nationwide UM benefits from the verdict because no Florida statute expressly authorizes one UM carrier to obtain a set-off for duplicate benefits paid by another UM carrier.

No AIG representative appeared at the evidentiary hearing. However, the insurers were able to introduce into evidence copies of correspondence showing the insured requested the insurers to permit him to settle his claim with AIG and waive their subrogation rights against AIG, and the insurers agreed. *See* § 627.727(6)(a), Fla. Stat. (2018) ("If an injured person … agrees to settle a claim with a liability insurer and its insured, and such settlement would not fully satisfy the claim for personal injuries … so as to create an underinsured motorist claim, then written notice of the proposed settlement must be submitted by certified or registered mail to all underinsured motorist insurers that provide coverage.").

The insurers then introduced into evidence a copy of the insured's settlement release of AIG. The AIG settlement release provided, in pertinent part:

> RELEASOR, for and in consideration of the total sum of FOUR HUNDRED EIGHTY THOUSAND SIX HUNDRED SIXTY SEVEN DOLLARS AND FIFTY CENTS ($480,667.50), and for other good and valuable consideration paid to and for the benefit of Jeffrey Wolfson, receipt of which is hereby acknowledged, by these premises do hereby remise, release, acquit, satisfy and forever discharge RELEASEES … from any and all … claims (whether presently known or unknown) … including parental and filial consortium claims … which against said RELEASEE the RELEASOR now has, and which the RELEASOR hereinafter can, shall, could or may have … arising from, relating to, raised in, alleged in, or reasonably inferable from the INCIDENT.

The AIG settlement release defined the terms "claims" and "releasor" as follows:

> **"CLAIMS"** herein refers to: all claims for legal damages and equitable remedies by the "RELEASOR" … against the "RELEASEE" … arising or inferable from the INCIDENT.

3

> **"RELEASOR"** herein refers to: Jeffrey Wolfson. RELEASOR shall also refer to any and all representatives, heirs, agents, executors, administrators, successors and/or assignees of Jeffrey Wolfson, as well as any relative of Jeffrey Wolfson … for legal damages or equitable remedies against the "RELEASEES" … that arises or that is inferable from the INCIDENT.

The insured also testified at the evidentiary hearing. He said the AIG settlement release's sole purpose was to settle his wife's unpled loss of consortium claim, not his claim for his injuries and lost earnings. The insured cited the AIG settlement release language providing it covered all claims by him and "any relative" for "any and all types of actions … including parental and filial consortium." Thus, he testified the AIG settlement benefits did not duplicate the jury-determined benefits against the insurers.

The insurers moved for a continuance to make another attempt at having an AIG representative appear at the hearing to rebut the insured's testimony. The trial court denied the motion.

The trial court then entered an order denying the insurers' motion for set off as to the AIG and Nationwide settlements. Regarding the AIG settlement, the order stated, "The Court <u>denies</u> a set off in the amount of $480,667.50 relating to the [AIG settlement release] and finds that the entire settlement amount of $480,667.50 was intended to solely satisfy [the insured's wife's] consortium claim, as evidenced by [the insured's] testimony corroborated by the Release of All Claims that he executed." Regarding the Nationwide settlement, the order stated, "The Court similarly <u>denies</u> a set off in the amount of $100,000 relating to the settlement with [Nationwide]."

The insurers filed a motion for rehearing in order to re-open the evidentiary hearing. A successor judge denied that motion.

### *This Appeal*

This appeal followed. The insurers cite the AIG settlement release's plain language to argue the trial court erred in finding the AIG settlement's purpose was to settle the insured's wife's unpled loss of consortium claim. The insurers also argue the trial court erred in not setting off the indisputably duplicated Nationwide UM benefits from the UM jury verdict against the insurers.

4

The insured responds the trial court properly relied on his testimony to find the AIG settlement's purpose was to settle his wife's unpled loss of consortium claim. The insured also argues the trial court correctly denied setting off the Nationwide UM benefits from the UM jury verdict, because no Florida statute expressly authorizes one UM carrier to obtain a set off for duplicate benefits paid by another UM carrier.

Applying de novo review, we agree with the insurers' arguments. *See Cornerstone SMR, Inc. v. Bank of Am., N.A.*, 163 So. 3d 565, 568 (Fla. 4th DCA 2015) ("Whether the trial court awarded a proper set-off is a pure question of law reviewed *de novo*, and no deference is given to the judgment of the lower courts.") (citation and internal quotation marks omitted). We address each argument in turn.

## 1. *The AIG Settlement*

Our conclusion to set off the AIG settlement is based on the AIG settlement release's plain language. "Because a release is a contract, it must be interpreted according to principles of contract law." *Berrios v. Orlando Reg'l Healthcare Sys.*, 100 So. 3d 128, 130 (Fla. 5th DCA 2012). "As with contracts generally, the language used in [a] release is the best evidence of the parties' intent. When that language is clear and unambiguous, the courts cannot indulge in construction or interpretation of its plain meaning." *Hurt v. Leatherby Ins. Co.*, 380 So. 2d 432, 433 (Fla. 1980). Similarly, "[w]hen the language of a release … is clear and unambiguous[,] a court cannot entertain evidence contrary to its plain meaning." *Sheen v. Lyon*, 485 So. 2d 422, 424 (Fla. 1986).

Here, the AIG settlement release clearly and unambiguously states it was only for the insured's benefit. The release provided, in pertinent part:

> RELEASOR, for and in consideration of the total sum of FOUR HUNDRED EIGHTY THOUSAND SIX HUNDRED SIXTY SEVEN DOLLARS AND FIFTY CENTS ($480,667.50), and for other good and valuable consideration paid to and **for the benefit of Jeffrey Wolfson**, receipt of which is hereby acknowledged, by these premises do hereby remise, release, acquit, satisfy and forever discharge RELEASEES … from any and all … claims (whether presently known or unknown) … including parental and filial consortium claims … which against said RELEASEE the RELEASOR now has, and which the RELEASOR hereinafter can, shall, could or may have … arising from, relating to, raised in, alleged in, or reasonably inferable from the INCIDENT.

(emphasis added).

The release does not mention the insured's wife, and the release's inclusion of "parental and filial consortium claims" is not related to any unpled spousal loss of consortium claim as matter of law. A parental consortium claim permits a child, including an adult child, to recover for the loss of consortium arising from the wrongful death of a parent. *Cruz v. Broward Cty. Sch. Bd.*, 800 So. 2d 213, 218 (Fla. 2001) (Shaw, J., dissenting). A filial consortium claim permits a parent to recover for loss of consortium arising from the wrongful death of a child, including an adult child. *Id.* Neither of those claims is in any way related to a spousal loss of consortium.

The release's definition of "RELEASOR" as including "any relative of" the insured also does not include a spousal loss of consortium claim. Again, the release clearly and unambiguous states it was "for the benefit of Jeffrey Wolfson." When viewed in that context, the release's definition of "RELEASOR" simply refers to those persons, besides the insured, who may release <u>his</u> claims on <u>his</u> behalf, not as persons who had pursued and released their own claims. *See Regions Bank v. Am. Leisure Resorts, Inc.*, 239 So. 3d 764, 764 (Fla. 3d DCA 2018), citing *Cahill v. Regan*, 184 N.Y.S.2d 348, 354 (N.Y. 1959) (in construing the meaning and coverage of a general release, the court must consider the controversy being settled and the purpose for which the release was actually given), and *Glassberg v. Lee*, 918 N.Y.S.2d 554, 555 (N.Y. 2011) ("While the meaning and scope of a release are determined within the context of the controversy being settled, a release cannot be read to cover matters which the parties did not intend to dispose of, and unless it is shown that a specified matter was in dispute at the time a purported release was given, it cannot be held to bar the releasor's rights as to that matter.") (internal citations omitted).

Even if the insured and his wife had privately agreed to unilaterally apportion the AIG settlement among themselves, the trial court was bound to ignore such a private unilateral apportionment when the AIG settlement release failed to expressly apportion the proceeds between them. As our supreme court held in *Dionese v. City of West Palm Beach*, 500 So. 2d 1347 (Fla. 1987):

> Both existing case law and fairness to the parties involved require us to ignore a private unilateral apportionment of settlement proceeds among plaintiffs, when the settlement agreement itself fails to apportion the proceeds among the plaintiffs.

....

> Private unilateral agreements by plaintiffs to divvy up the proceeds of a general settlement agreement are contrary to all concepts of fairness. Private unilateral agreements to apportion settlement proceeds would often result in a windfall recovery. ...

> The only proper method of ensuring against duplicate recoveries in an undifferentiated lump sum settlement situation is to set-off the total settlement funds against the total jury award. If necessary, the settlement can then be allocated proportionally against the jury verdict for each cause of action tried, thus preserving the distinct nature of the separate claims.

> ....

> For the reasons expressed, we ... hold that ... an agreement to apportion the proceeds of a settlement agreement must be found on the face of the settlement agreement and agreed to by all of the parties involved in the settlement.

*Id.* at 1348, 1350-51; *see also Cornerstone,* 163 So. 3d at 569 ("Where a settlement is undifferentiated and general, the aggregate of the amount of the settlement should be set off against the judgment."); *Alexander v. Seaquest, Inc.,* 575 So. 2d 765, 765-66 (Fla. 4th DCA 1991) (where a private and unilateral settlement apportionment occurred without notice, "[t]he trial judge properly set-off the undifferentiated lump sum settlement against the total jury award in order to ensure that appellant did not recover twice for the same wrong").

### 2. *The Nationwide Settlement*

The trial court also erred in concluding the insurers' request to set off the Nationwide settlement was "similarly denied," which we must presume refers to the trial court's reasoning for not setting off the AIG settlement. Like the AIG settlement release, the Nationwide settlement release clearly and unambiguously states it was only for the insured's benefit. The Nationwide settlement release does not mention the insured's wife, and its definition of "Releasing Party" as including "his heirs, assigns, legal representatives, successors and personal representatives" is not a reference to, or inclusion of, a spousal loss of consortium claim.

If the trial court inadvertently used the word "similarly" when referring to its denial of the Nationwide settlement set-off, the trial court's denial still was error. The only argument upon which the insured relies in seeking to affirm the trial court's denial of the $100,000 Nationwide UM benefits set-off is that no Florida statute expressly authorizes one UM carrier to obtain a set-off for duplicate benefits paid by another UM carrier.

That argument lacks merit. Section 627.727(1), Florida Statutes (2018), requiring motor vehicle liability insurance policies issued in this state to also provide uninsured and underinsured motor vehicle coverage, states, in pertinent part:

> The coverage described under this section shall be over and above, but shall not duplicate, the benefits available to an insured under any workers' compensation law, personal injury protection benefits, disability benefits law, ***or similar law***; under any automobile medical expense coverage; under any motor vehicle liability insurance coverage; or from the owner or operator of the uninsured motor vehicle or any other person or organization jointly or severally liable together with such owner or operator for the accident; and such coverage shall cover the difference, if any, between the sum of such benefits and the damages sustained, up to the maximum amount of such coverage provided under this section.

§ 627.727(1), Fla. Stat. (2018) (emphasis added).

Although section 627.727(1) does not define "similar law" or expressly refer to "any uninsured or underinsured motorist law" as it does for other types of insurance laws, we consider "similar law" to encompass section 627.727 itself, because section 627.727 is a legislatively-enacted coverage, just as "workers' compensation law, personal injury protection benefits, and disability benefits law" are legislatively-enacted coverages. *See Nehme v. Smithkline Beecham Clinical Labs., Inc.*, 863 So. 2d 201, 205 (Fla. 2003) ("Under the doctrine of *noscitur a sociis* (a word is known by the company it keeps), one examines the other words used within a string of concepts to derive the legislature's overall intent."). Thus, pursuant to section 627.727, we conclude benefits provided under a UM policy cannot duplicate benefits already paid to an insured under another UM policy.

Applying that conclusion here, the $100,000 Nationwide UM benefits cannot duplicate the benefits under the insurers' two UM policies. Put another way, because the insured has not disputed the $100,000

Nationwide UM benefits duplicated the jury-determined UM benefits against the insurers, the $100,000 Nationwide UM benefits must be set off from the jury verdict.

Our conclusion is consistent with our decision in *Aetna Casualty & Surety Co. v. Langel*, 587 So. 2d 1370 (Fla. 4th DCA 1991). There, Langel was injured by two uninsured motorists in two nearly simultaneous accidents. *Id.* at 1372. Fortunately for Langel, he was covered by two Aetna policies – a $300,000 UM policy issued to his mother-in-law, and a $100,000 UM policy issued to him. *Id.* at 1371-72. Langel made a claim against both policies to cover his damages. *Id.* at 1372. Aetna paid Langel the full $100,000 under his UM policy. *Id.* Aetna then brought an action to determine whether it owed any further damages to Langel under his mother-in-law's $300,000 UM policy. *Id.* at 1371-72.

At trial, the Langel argued, and Aetna conceded, he was entitled to $46,000 in past medical expenses and $299,000 in future rehabilitation expenses, a total of $345,000. *Id.* at 1373. The main dispute involved the amount of the Langel's future medical expenses, lost earnings and intangibles. *Id.* The jury returned a non-itemized verdict of $450,000 in damages, which was $105,000 more than the $345,000 in damages stipulated to the jury. *Id.* The jury also found Langel's comparative fault was 10%, thus reducing the jury verdict to $405,000. *Id.* at 1372.

The trial court then determined Aetna was entitled to set off from the $405,000 jury verdict the $100,000 which Aetna paid Langel under his UM policy. *Id.* As a result, the trial court entered a $305,000 net judgment in Langel's favor against Aetna under his mother-in-law's UM policy. *Id.*

Langel appealed the $100,000 set-off. *Id.* We affirmed, reasoning:

> [A] UM settlement amount may … be set off if it *duplicates* damages otherwise awarded. Section 627.727(1), Fla. Stat. (1989). But the burden is on the UM carrier to demonstrate that the settlement to whatever extent constituted a duplication of the amount awarded by the jury.
>
> ….
>
> [T]here is every indication – and no reason to believe otherwise – that the amount awarded by the jury was the *total* amount of damages suffered by [Langel] in the two accidents and that the amount awarded over and above the stipulated amounts included intangibles as well as the disputed future

9

special damages. This conclusion is bolstered by the jury's expressed inability to apportion the damages, the necessary implication being that the award covered both accidents.

Clearly, the damages finally awarded by the jury included the damages contemplated by the $100,000 settlement. The "common sense" of the matter demonstrates duplication. It therefore would be inequitable to deny a set-off for the settlement and, as to this, the trial court was correct.

*Id.* at 1373 (internal citations omitted).

As in *Langel*, the instant case also involves multiple UM policies – the Nationwide UM policy which settled for $100,000, and the insurers' two UM policies which went to trial here. The insured has not disputed the $100,000 Nationwide UM benefits duplicated the jury-determined UM benefits against the insurers. Thus, pursuant to section 627.727(1), the $100,000 Nationwide UM benefits must be set off from the jury verdict.

The insured's brief distinguishes *Langel* from the instant case on the basis that, "in *Langel* the insurer that sought and obtained the set-off (i.e., Aetna) was the same insurer that had paid the settlement monies to the plaintiff (i.e. Aetna). Further, unlike the instant case, *Langel* involved two separate accidents." However, the insured's brief does not attempt to ascribe any significance to those factual distinctions. We do not see any significance to those factual distinctions either.

In the alternative, the insured argues, "*Langel* was wrongly decided and this Court should recede from *Langel*." The insured argues we should instead follow our sister court's holding in *State Farm Mutual Auto Insurance Co. v. Vega*, 753 So. 2d 738 (Fla. 3d DCA 2000). However, the insured's reliance on *Vega* is misplaced.

In *Vega*, the plaintiff was insured for UM benefits by State Farm. *Id.* at 739. The plaintiff also was insured for health care benefits by Guardian, through his private employer. *Id.* After the plaintiff was injured by an underinsured motorist, the plaintiff received health care benefits from Guardian, and sued State Farm for UM benefits. *Id.* at 739-40. The case proceeded to trial, where a jury determined the plaintiff's damages, including medical expenses. *Id.* at 740. State Farm moved to set off from the verdict Guardian's payment of the plaintiff's medical expenses. *Id.* State Farm argued Guardian's health care benefits qualified under section 627.727(1) as benefits which are "available to an insured under any

workers' compensation law, personal injury protection benefits, disability benefits law, or similar law." *Id.* The trial court denied that set-off. *Id.*

The third district affirmed, reasoning in pertinent part: "Guardian's group health insurance benefits were payable pursuant to its private contract with [the plaintiff] and not payable pursuant to any legislatively enacted 'similar law' as contemplated by section 627.727(1) of the uninsured motorist statute." *Id.*

Unlike the Guardian health care benefits paid to the plaintiff pursuant to a private contract in *Vega*, the $100,000 Nationwide UM benefits were payable pursuant to a legislatively-enacted "similar law," that is, section 627.727 itself. Thus, as in *Langel*, we see nothing in section 627.727 which permits one payment of UM benefits under that statute to duplicate another payment of UM benefits under that statute. And because the insured here has not disputed the $100,000 Nationwide UM benefits duplicated the jury-determined UM benefits, section 627.727(1) mandates the $100,000 Nationwide UM benefits be set off from the jury verdict.

### *Conclusion*

Based on the foregoing, we affirm the jury verdict determining the insured's damages to be $810,000 for loss of earnings, $369,629 for medical damages, and $400,000 for pain and suffering, for a total $1,579,629.00.

However, we reverse the trial court's denial of the insurers' motion for set off, and thus reverse the trial court's final judgment. We remand for the trial court to: (1) enter an order granting the insurers' motion to set off from the $1,579,629.00 jury verdict the $480,667.50 AIG settlement and the $100,000 Nationwide settlement, and (2) enter an amended final judgment of $998,961.50 in the insured's favor.

*Affirmed in part, reversed in part, and remanded with instructions.*

GROSS and FORST, JJ., concur.

*            *            *

**Not final until disposition of timely filed motion for rehearing.**

11